09-0799-bk(L)

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2009
(Argued: November 4, 2009;  Decided: February 8, 2011; Amended February 9, 2011)
Docket Nos. 09-0799-bk(L), 09-0808-bk(Con), 09-0810-bk(Con)
_____

In re: ADELPHIA RECOVERY TRUST
_____

ADELPHIA RECOVERY TRUST, Successor to the Official Committee of
Unsecured Creditors of Adelphia Communications Corporation,

*Defendant-Cross-Claimant-Appellant*,

*-v.-*

HSBC BANK USA, NATIONAL ASSOCIATION, FLEET NATIONAL BANK,
KEY BANK NATIONAL ASSOCIATION,

*Plaintiffs-Cross-Claimants-Appellees*.

_____

BEFORE:    B.D. PARKER, HALL, and LYNCH, *Circuit Judges*.
_____

Appeal from a judgment of the United States District Court for the Western District of

New York (Arcara, *J.*), affirming in part and reversing in part the judgment of the United States

Bankruptcy Court for the Western District of New York (Kaplan, *Bankr. J.*).  The district court

1

barred the Adelphia Recovery Trust from pursuing fraudulent conveyance claims against the appellee banks. AFFIRMED.

———————————

DAVID M. FRIEDMAN (Michael C. Harwood, David J. Shapiro, *on the brief*), Kasowitz Benson Torres & Friedman LLP, New York, New York, *for Defendant-Cross-Claimant-Appellant* Adelphia Recovery Trust.

WILLIAM J. BROWN (David J. McNamara, Angela Z. Miller, Joshua P. Fleury, *on the brief*), Phillips Lytle LLP, Buffalo, New York, *for Plaintiff-Cross-Claimant-Appellee* HSBC Bank USA, N.A.

HOWARD B. LEVI, Levi Lubarsky & Feigenbaum LLP, New York, New York, *for Plaintiff-Cross-Claimant-Appellee* Bank of America, N.A., successor by merger to Fleet National Bank.

ALEC P. OSTROW (Jocelyn Keynes, *on the brief*), Stevens & Lee, P.C., New York, New York, *for Plaintiff-Cross-Claimant-Appellee* Key Bank, N.A.

———————————

HALL, Circuit Judge:

This case requires us to decide whether a debtor-in-possession is barred from bringing fraudulent conveyance claims against three banks because it actively participated in and facilitated a sale of the assets of a different debtor-in-possession, to which it was a creditor, while remaining silent about the possibility that it would bring fraudulent conveyance claims with respect to its prior take-outs of loans secured by those assets. The bankruptcy court (Kaplan, *Bankr. J.*) concluded that such a claim was barred as against only one of the banks, because only that bank actively participated in the hearing to confirm the sale. The district court (Arcara, *J.*) affirmed in part and reversed in part, and held that the fraudulent conveyance claims were barred as to all of the banks by four separate and independent doctrines: ratification, *res judicata*, judicial estoppel, and quasi-estoppel.

2

As we shall explain, we perceive difficulties with the district court's ratification analysis, but agree with it that *res judicata* bars the fraudulent conveyance actions with respect to the bank that actively participated in the sale hearing. We also agree with the district court that judicial estoppel bars those actions against the other two banks, and we therefore affirm that court's judgment.

## BACKGROUND[1]

I.    The parties and other relevant entities

Because this case has many corporate players and has played out in numerous forums across the years, we set forth the following *dramatis personæ*.

a.    Adelphia Communications Corporation ("Adelphia Corp.")

Adelphia Corp. was once the fifth-largest cable television company in the United States. It was founded by John Rigas in the early 1950s, and became a public corporation in 1986. In June 2002, Adelphia Corp. filed for bankruptcy, all shareholder value was lost, and John Rigas and his son Timothy Rigas were subsequently convicted of bank fraud and securities fraud for looting the company. *See United States v. Rigas*, 490 F.3d 208, 211-14 (2d Cir. 2007). Adelphia Corp.'s bankruptcy proceedings took place in the Bankruptcy Court for the Southern District of New York (the "Adelphia bankruptcy"). In this opinion, the term "Adelphia Corp." shall be used exclusively to refer to the pre-bankruptcy corporation. When referring to actions taken by the company after it filed for bankruptcy but before its Chapter 11 Plan of Reorganization was confirmed, this opinion will refer to the "Adelphia Debtor-in-Possession" ("Adelphia D-I-P").

[1] The facts of this case are, to put it mildly, enormously complex. Like the district court and bankruptcy court before us, we have endeavored to set forth the facts accurately while making necessary simplifications for the sake of concision.

b.      Adelphia Recovery Trust (the "ART")

The ART, the appellant here, is a Delaware statutory trust created pursuant to the Chapter 11 Plan of Reorganization that was confirmed by the Adelphia bankruptcy court in February 2007.  It is the successor entity to the Official Committee of Unsecured Creditors of Adelphia Corp. (the "Committee"), and it is authorized by the Plan to pursue certain causes of action held by Adelphia Corp. and to administer the proceeds from those causes of action on behalf of holders of interests in the ART.  Under the terms of the Plan, Adelphia Corp.'s creditors and its equity holders received various combinations of interests in the ART, cash, stock in Time Warner Cable (whose stock was used as part of the purchase price of Adelphia Corp. at the bankruptcy sale), and rights to excess reserves.  *See generally* http://www.adelphiarestructuring.com/RecoveryTrust.aspx (last visited January 17, 2011).  This case arises from one of the many causes of action the ART is authorized to pursue.

c.      Niagara Frontier Hockey, L.P. ("NFHLP")

NFHLP was a Delaware partnership formed in March 1998, and its main assets were the Buffalo Sabres (a franchise of the National Hockey League) and an interest in the HSBC Arena, home to the Sabres.  NFHLP ran the hockey team and the arena through wholly-owned subsidiary companies, including Crossroads Arena, LLC ("Crossroads") and Buffalo Sabres Concession, LLC ("BSC").  In July 2000, John Rigas and his sons, using Adelphia money, bought out the limited partners of NFHLP.  In January 2003, NFHLP and it subsidiaries filed for bankruptcy in the Bankruptcy Court for the Western District of New York (the "NFHLP bankruptcy").

d.      Patmos, Inc.

4

Patmos is a Delaware corporation incorporated in March 1998. John Rigas was the president of Patmos, and his sons were executive vice presidents. Patmos was wholly owned by John Rigas and members of his immediate family. In July 2000, Patmos became the General Partner of NFHLP.

  e.  Sabres, Inc.

Sabres, Inc., is a Delaware corporation incorporated in May 1995 and a wholly owned subsidiary of Adelphia Corp. As of 2000, John Rigas and his sons comprised all of the directors of Sabres, Inc. This opinion will always refer to this corporate entity as "Sabres, Inc.," and to the hockey team itself as "the Sabres" or "the hockey team." Sabres, Inc., was NFHLP's largest creditor at the time NFHLP filed for bankruptcy, for reasons that will become apparent. Sabres, Inc., filed for bankruptcy in June 2002, simultaneously with Adelphia, its parent.

  f.  The banks

The appellees here are three national banking associations: HSBC Bank USA, N.A. ("HSBC"), Fleet National Bank ("Fleet")[2], and Key Bank, N.A. ("Key"). This opinion will refer to the three collectively as the "Banks."

---

[2] The successor-by-merger to Fleet is Bank of America, N.A., but this opinion will continue to refer to this entity as "Fleet" for simplicity's sake.

II.     The loans are made

In the 1990s, NFHLP and its wholly owned subsidiaries took out the following three loans with the Banks.  Pursuant to these three loans, the Banks had security interests in substantially all of NFHLP's assets.

a.     The Construction Loan

In May 1995, Crossroads borrowed $35 million pursuant to a "Building Loan Contract" agreed to by Crossroads, HSBC, Key, and Fleet.  On this loan, HSBC was the agent, and HSBC, Key, and Fleet were all lenders.  The purpose of this loan was to enable the construction of a new arena for the hockey team.

b.     The Concession Loan

At the same time that Crossroads took out the Construction Loan, BSC borrowed $32.5 million pursuant to a "Concession Loan Agreement" agreed to by BSC, Fleet, and Key.  On this loan, Fleet was the agent, and Fleet and Key were the lenders.  The purpose of this loan was to finance food and concession equipment at the hockey team's new arena.

c.     The Revolver Loan

In February 1997, NFHLP — this time borrowing in its own name rather than through any subsidiary — opened a revolving line of credit, up to a maximum of $12 million, with Fleet. The purpose of this loan was to give the hockey team an operating line of credit.

III.    Two of the loans are sold

In March 2000, Sabres, Inc., entered into assignment agreements with the Banks to purchase all of the Banks' interests in the Construction Loan and the Revolver Loan (thus, it acquired interests from all three Banks with respect to the Construction Loan and the interests of

6

Fleet with respect to the Revolver Loan). As a result of these transactions, NFHLP was thereafter required to make all payments due on these two loans to Sabres, Inc., rather than to the Banks. Thus, Adelphia Corp., through its wholly owned subsidiary Sabres, Inc., paid approximately $34.1 million to acquire the two loans ($18,583,542 to Fleet, $11,595,398 to HSBC, and $3,902,444 to Key).[3] The sale of these loans to Sabres, Inc., occurred simultaneously with the Rigases' acquisition of NFHLP via Patmos.

Although the Banks had intended to sell the Concession Loan as well, this did not occur because the consent of a necessary third party — specifically, the holder of the contract to operate the arena concession stands in which Fleet held a security interest — could not be obtained. Instead, Adelphia Corp. made certain continuing principal and interest payments on the Concession Loan on NFHLP's behalf.

According to the ART's view of the facts, all of this occurred because the hockey team was losing money. Because NFHLP was in default on the loans and was at risk of bankruptcy, the ART asserts, John Rigas and the Banks came to an agreement: if Adelphia Corp. (through Sabres, Inc.) were to buy the Loans, the Banks (whose losses as a result of any default on the loans would thereby be cut) would give the necessary consent for Rigas (through Patmos, wholly owned by the Rigases) to buy out the limited partners in NFHLP and become the sole owner of the hockey team. By acquiring the Construction and Revolver Loans, Adelphia Corp. (through Sabres, Inc.) became NFHLP's major secured creditor, and the ART calculates that between

---

[3] Technically, the contracts that transferred the loans from the Banks to Sabres, Inc., gave Sabres, Inc., a 95% interest in the loans that would convert to a 100% interest upon the National Hockey League's consent to the transfer, but the interest held by Sabres, Inc., eventually ripened into its 100% ownership of the loans.

1995 and the date of Adelphia Corp.'s 2002 bankruptcy, John Rigas caused Adelphia to invest more than $200 million in NFHLP.

In short, the ART takes the position that John Rigas caused Adelphia Corp. to prop up NFHLP and the hockey team despite inadequate economic benefit to Adelphia Corp. from doing so. The NFHLP bankruptcy court, for its part, recognized that although Patmos was nominally the owner of NFHLP and NFHLP the nominal owner of the hockey team, Adelphia Corp. "was the likely *equitable* owner of the Sabres entities, in light of what seems to be the use of Adelphia [Corp.] funds to purchase the Sabres for Rigas." Bankr. Ct. Op. at 5 (emphasis added).

In a Form 8-K disclosure filed with the Securities and Exchange Commission in May 2002, Adelphia Corp. disclosed that it had created a Special Committee to investigate transactions between Adelphia Corp. and certain Rigas-family entities. After summarizing the Buffalo Sabres-related transactions, including the loans between the Banks and NFHLP, the Form 8-K stated that "[t]he Special Committee is also investigating whether the Company received fair value for payments it made pursuant to the foregoing arrangements." Adelphia Commc'ns Corp. Form 8-K filed May 24, 2002.

As noted above, Adelphia Corp. filed for bankruptcy in the Southern District of New York in June 2002. Several months later, the Adelphia D-I-P hired independent accountants to analyze various transactions Adelphia Corp. had entered into in its final prepetition years, including its transactions involving NFHLP and its subsidiaries. One such accountant, Robert J. DiBella, testified at a subsequent deposition that he first became aware of Adelphia Corp.'s takeout of the NFHLP's loans sometime between September 2002 and December 2002, and discussed it with an officer of Adelphia in the same time frame. In a report initially prepared in

8

December 2002 and later updated in December 2003 and September 2004, DiBella set forth a proposed methodology for calculating the value of the loan takeouts to Adelphia. In addition, billing records submitted by the Adelphia D-I-P in the same time period showed that some of the attorneys were investigating the payments made by Sabres, Inc., to the Banks.

IV.     NFHLP sells the hockey team to a third party

NFHLP filed for bankruptcy in the Western District of New York in January 2003. In its proceeding, NFHLP reported $64 million in assets and $235 million in liabilities, with the majority of the liabilities owed to Adelphia Corp. After the NFHLP bankruptcy proceeding began, the Adelphia bankruptcy court gave the Adelphia D-I-P permission, as NFHLP's largest creditor, to appear in the NFHLP bankruptcy court to promote the sale of the hockey team's assets. Specifically, the Adelphia bankruptcy court ordered that the Adelphia D-I-P was "authorized in the exercise of [its] business judgment to consent to the sale of certain assets of [NFHLP] in connection with any sale process [under the Bankruptcy Code]" and that "conveyance of [the Adelphia D-I-P's] interest in [NFHLP] in connection with any sale process . . . shall be free and clear of any liens, interests or encumbrances of any of [the Adelphia D-I-P's] creditors or lenders, with such Liens, if any, to attach to the net proceeds, subject to the rights and defenses of [Adelphia] with respect thereto . . .." Bankr. Ct. Order at 2.

The NFHLP bankruptcy court gave notice of a sale pursuant to 11 U.S.C. § 363, and only one bidder appeared: Hockey Western LLC ("Hockey Western"). The sale hearing was held in April 2003. The proposed asset purchase agreement, entered into between Hockey Western on one side and NFHLP, BSC, and Crossroads on the other side, provided that the hockey team's "[a]ssets will be sold free and clear of all liens, claims, interests and encumbrances." Mot. for

9

Approval of Asset Purchase Agreement at 10. The Adelphia D-I-P, for its part, executed a stipulation (1) waiving any and all rights it might have to receive any part of the consideration paid by Hockey Western for the hockey team assets sold by NFHLP and its subsidiaries and (2) releasing all liens and claims against those assets.

Of course, this only accounted for the Construction Loan and the Revolver Loan, because Adelphia Corp.'s March 2000 attempt to purchase the Concession Loan from Fleet had been blocked by the operator of the concession stands. Thus Adelphia Corp. held no lien interests via the Concession Loan, and Fleet (unlike HSBC and Key) was still a party in interest in the NFHLP bankruptcy at the time of the asset sale because it continued to own that Loan. For that reason, a different resolution had to be reached with respect to the Concession Loan in order to enable a free-and-clear sale. Accordingly, the Adelphia D-I-P agreed to allow the Concession Loan to be paid in full from the proceeds of the asset sale, and Fleet gave the Adelphia D-I-P an off-set for $11 million in payments Adelphia Corp. had made earlier in debt-support of NFHLP.

At the asset sale hearing, counsel for the Adelphia D-I-P explained for the bankruptcy court the consideration that the Adelphia D-I-P was receiving from the sale:

> There are two elements of consideration in this transaction that we will receive. One is a surrender of two letters of credit that back up the concession loan once it's been paid off, and the other is the cure amount that is reflected in a new provision in the order, in respect to the assumption of the broadcast agreement [regarding the hockey team's games].
>
> Other than that, the Adelphia [D-I-P] ha[s] agreed, given the size of [its] claims which would have completely warped the other trade creditors in the case, to waive any entitlement to participate in the balance of the consideration to be paid under the sale agreement.

Tr. of Sale H'rg at 31-32. Later, the bankruptcy court stated:

> . . . I guess what we have, having read the stipulations, is that everybody who

10

anybody thinks actually has legal or equitable or beneficial interest in some kind of ownership or lien on the assets of these debtors have all signed the same stipulation; essentially identical stipulations, so that we needn't worry about that unless there's some entity that slipped through the cracks, but I doubt that would have happened with the quality of representation that we have here.

*Id.* at 42. Immediately after this remark, counsel for the NFHLP debtor-in-possession asked — and the bankruptcy court echoed the question — whether any party wished to be heard in objection to the sale. No party — the Adelphia D-I-P included — said a word. In an April 2003 order, the bankruptcy court approved the sale "free and clear."

      V.      <u>The Adelphia D-I-P brings a fraudulent conveyance action against the Banks</u>

In July 2003 — less than three months after the NFHLP bankruptcy court approved the free-and-clear sale of the hockey team assets to Hockey Western — the Adelphia D-I-P brought a fraudulent conveyance action in the Adelphia bankruptcy court against 450 banks, including HSBC, Key, and Fleet. The premise of this action was that "[t]he Rigas [f]amily used [Adelphia Corp.] as its piggy bank to fund personal expenses at will and to maintain voting control over Adelphia." Compl. at 9. The complaint alleged that the banks had "knowingly and eagerly loaned" money to Rigas family entities despite the banks' awareness that only Adelphia Corp. could have had "the wherewithal to repay" those debts and that the Rigases had used the proceeds of the loans to enrich themselves at Adelphia Corp.'s expense. *Id.* at 9-11. The complaint alleged that the transactions at issue, including the loans made to facilitate operation of the hockey team, "did not benefit [Adelphia Corp.]." *Id.* at 11-12. The claims relevant here are Counts 17 through 24, wherein the Adelphia D-I-P contended that the $34 million paid by Adelphia Corp. (via Sabres, Inc.) in March 2000 to acquire the Construction Loan and Revolver Loan was greater than fair consideration under N.Y. Debtor and Creditor Law § 272 and that the

11

Banks had not been good-faith transferees under New York law and 11 U.S.C. § 550(b). *Id.* at

172-84. With respect to Fleet and the Concession Loan, the complaint alleged that the payments

Adelphia Corp. had made to Fleet between June 1999 and May 2002 — i.e., the payments that

resulted in the $11 million set-off at the time of the asset sale — were fraudulent.

The Banks reacted to the initiation of this fraudulent conveyance action in two ways.

First, they filed proofs of claim in the NFHLP bankruptcy proceeding, asserting that if the

Adelphia D-I-P were successful in its fraudulent conveyance claims, the Banks would have a

claim against the NFHLP debtors in the amount of any judgment against them because it was no

longer possible to rescind the transfer of the assets that were sold free and clear, leaving the

Banks with no ability to remedy the fraudulent conveyance claims by getting the loans back.

Second, after the NFHLP debtors brought a declaratory judgment action seeking a declaration

that the Banks' claims should be subordinated to other claims, the Banks filed cross-claims in the

NFHLP bankruptcy court seeking to bar the fraudulent conveyance claims in the Adelphia

bankruptcy court. Faced with the prospect of dueling litigations, the two bankruptcy courts

communicated directly with each other. They subsequently entered reciprocal orders allowing

specific issues related to the fraudulent conveyance claims to be litigated exclusively in the

NFHLP bankruptcy court. The Adelphia bankruptcy court defined the issue over which it was

relinquishing jurisdiction (the same issue that is now before us on this appeal):

> Th[e] issue is whether the participation of the Adelphia [D-I-P] in the processes of
> asset sale and plan confirmation in the [NFHLP bankruptcy] has the legal effect
> of having barred the prosecution of the present Adversary Proceeding as against
> HSBC, Key Bank, and/or Fleet Bank with regard to the payments made upon, or
> in satisfaction of, loans that were originally extended by those banks to [t]he
> [NFHLP] debtors before any Adelphia debtor or affiliate, or Rigas or any Rigas
> entity or affiliate, owned or controlled any of the [NFHLP] debtors.

12

Order of U.S.B.C., S.D.N.Y., dated June 14, 2004. The Adelphia bankruptcy court added that, to the extent necessary for deciding that issue, it also relinquished jurisdiction over interpretation of its earlier order authorizing the Adelphia D-I-P "to exercise [its] judgment in granting or withholding consent to the process of sale and confirmation as to the [NFHLP] debtors." *Id.* The NFHLP bankruptcy court's order accepted jurisdiction on the same terms.

In November 2006, the attorney who had represented the Adelphia D-I-P at the NHFLP sale hearing submitted a declaration to the bankruptcy court which read, in relevant part:

> At no time prior to the Sale Hearing was [my law firm] investigating any possible fraudulent conveyance claims that might be asserted against the Banks. I was not privy to the investigation of the Committee or its agents and was not informed of the findings of their investigation until July 2003, shortly before [the fraudulent conveyance action] was commenced. . . .
>
> It did not occur to me at the Sale Hearing that any fraudulent conveyance claims that may be asserted by [the Adelphia D-I-P] . . . were being waived, or that the existence of such claims was an issue being conducted explicitly or implicitly. Certainly I was not aware of the claims at the time.
>
> When I appeared before this court at the Sale Hearing, I had no intent to mislead this [c]ourt or the Banks into thinking that [the Adelphia D-I-P] . . . would never assert fraudulent conveyance claims against the Banks.

Bankr. Ct. Op. at 30-31.

### VI.     The bankruptcy court's decision

In a detailed and ruminative opinion, the bankruptcy court granted summary judgment on the fraudulent conveyance claims in favor of Fleet with respect to the claims against it, but ordered that the fraudulent conveyance actions should be allowed to go forward with respect to HSBC and Key.[4] The bankruptcy court stated that, if it had been informed that the Adelphia D-

---

[4] The bankruptcy court issued several versions of its opinion, seeking input from the parties, before reissuing a final version. Our opinion refers exclusively to the final, "redlined" version of the bankruptcy court opinion.

13

I-P was reserving its right to bring fraudulent conveyance actions in its own bankruptcy proceeding, it "would not have approved the sale without the consent of the Banks or a full-blown resolution as to 'who owned the lien rights.'" Bankr. Ct. Op. at 20-21. The bankruptcy court added that, even if the sale had been necessary to keep the hockey team in Buffalo, it would not have hesitated to prevent the sale if the 11 U.S.C. § 363(f) requirements for a free-and-clear sale had not been met.

The bankruptcy court then explained why it thought HSBC and Key were in a different position from Fleet. It noted that "they may have been remote from the N[FHLP] assets in a legal sense (their position having been bought out (they say) in 2000 (three years before the § 363 sale)), [but] they were not remote, in fact, from what was happening in the N[FHLP] case." Given Adelphia Corp.'s May 2002 Form 8-K disclosures and that counsel for HSBC was also counsel for the National Hockey League and deeply involved in the hockey team assets sale, the bankruptcy court suggested that all three Banks ought to have been well aware of what was transpiring in the NFHLP case. The bankruptcy court thus rejected the claim of HSBC and Key that "they never dealt with the Rigases [and] that they merely accepted payments on the debts incurred by the pre-Rigas Sabres." Bankr. Ct. Op. at 24.

Turning to its first conclusion of law, the bankruptcy court held:

[R]atifying the ownership of the liens, etc., in open [c]ourt here was a necessary prerequisite to the § 363 sale and [o]rder here, and so it is a *bar* to Counts 17-24, but only to the extent of the value Sabres, Inc. (and therefore Adelphia) *received* in exchange for the $34 million paid to HSBC and Key plus $11 million transferred to Fleet in debt-support payments credited by Fleet when settling-up with Adelphia. It may also be a *complete* defense to Counts 17-24, as discussed later. And this [c]ourt finds that "ratification" did indeed occur as to what was received in 2000 from the Banks. . . .

14

> Unlike Fleet, HSBC and Key were not here in court to take a particular position regarding the sale. The *most critical fact* for these purposes is that this was a *judicial* sale, not a sale on the street. In such a sale the judge protects the innocent absentee. A simple mention of HSBC and Key by Adelphia would have caused this [c]ourt to bring them here. . . .
>
> A judicial sale . . . depends on disclosure of "hazy" ownership. Even more so as to sales "free and clear" by a bankruptcy court. . . .
>
> HSBC and Key may avail themselves of the ruling that Adelphia ratified, in this [c]ourt, what it *received* in the attacked transfers.

Bankr. Ct. Op. at 27-29 (emphases in original).

The bankruptcy court then gave lengthy consideration to whether the Adelphia D-I-P and its counsel "knew" at the time of the asset sale that it might later bring an avoidance action against the Banks. Noting the importance of counsel's duty to the court, the bankruptcy court offered a discourse on the level of preparation it expected from experienced bankruptcy counsel before a § 363 sale, and speculated that counsel for the Adelphia D-I-P had taken insufficient steps to inform himself about the causes of actions that the Adelphia D-I-P might soon pursue.[5] The bankruptcy court went on:

> If HSBC and Key had appeared here, this [c]ourt would not ennoble that decision by Adelphia's counsel to remain silent about them. A big, complex Chapter 11 such as Adelphia demands big, complex administrative resources to make sure that the debtor is not "messing up" the N[FHLP] D-I-P's critical efforts to reorganize the N[FHLP] Debtors and the N[FHLP] [c]ourt's docket.

Bankr. Ct. Op. at 36.

But the bankruptcy court found that "HSBC and Key derive no benefit from [its ruling], other than the ability to defend in the Adelphia [c]ourt on the basis, in part, that Adelphia ratified

---

[5] The bankruptcy court subsequently redacted much of its discussion of the motivations and knowledge of the Adelphia D-I-P's counsel, leaving those portions of its opinion intact for appellate review, but under seal.

15

the fruits of the challenged transfers." Bankr. Ct. Op. at 37-38. That court's view was that HSBC and Key had failed to justify their non-appearance in the NFHLP court, despite having "dealt extensively with Rigas and Adelphia and t[aken] payment from Adelphia other than in the ordinary course of the debts owed by the pre-Rigas Sabres." Bankr. Ct. Op. at 38-40. But it ruled that Fleet was different because "Adelphia should not have consented to cash-out Fleet — a convenient resolution to an obstacle to the sale that Adelphia supported — while Adelphia was considering suing Fleet for a major portion of the cash-out amount, if Adelphia was relying on § 546 to later sue Fleet." *Id.* at 41-42. The bankruptcy court thus held that the Adelphia D-I-P was barred from bringing any fraudulent conveyance claims against Fleet, but that it could return to the Adelphia bankruptcy court and pursue its claims against HSBC and Key.

The ART appealed the ruling in favor of Fleet to the district court, and HSBC and Key cross-appealed the rulings against them.

VII.    The district court's decision

In February 2009, the district court issued an order affirming the bankruptcy court with respect to Fleet but reversing the bankruptcy court with respect to HSBC and Key. *See HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*, No. 07 Civ. 553A, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009). The district court agreed with the bankruptcy court that, with respect to Fleet, the Adelphia D-I-P had "ratified the very transactions (i.e., the March 2000 sale of the Construction and Revolver Loans to Adelphia and Adelphia's payments on the Concession Loan) that [the ART] now contend[s] should be avoided." *Id.* at *7. The district court rejected the notion that the Adelphia D-I-P did not have "full knowledge" of the facts surrounding the allegedly fraudulent transfer at the time of the sale hearing. *Id.* The district court also took the

16

view that the "proper remedy in a fraudulent transfer action is rescission of the underlying transaction, not just a piece of it, such as the purchase price." *Id.* at *8 (citing *Grace Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006)). On this basis, the district court rejected the ART's "attempts to apply ratification to only the sale of the loans, while preserving a fraudulent transfer claim as to the purchase price." *Id.*

Unlike the bankruptcy court, the district court found the ratification analysis to be as applicable to HSBC and Key as it was to Fleet. *Id.* at *9-10. The district court stated that "there was no reason for HSBC and Key to be present at the sale hearing" because "[t]he uncontested evidence is that the [contracts] governing the sale of th[e] [Construction and Revolver] Loans ripened into 100% ownership by Sabres, Inc.[,]" and therefore, "as far as HSBC and Key were aware, at the time of the sale hearing, they had no ownership interests whatsoever in the Loans and had no reason to appear." *Id.* at *10. The district court ruled that the Adelphia D-I-P, by remaining silent at the April 2003 sale hearing, ratified the purchase of the loans with respect to HSBC and Key as much as with respect to Fleet. *Id.*

Alternatively, the district court found that several other principles barred the ART from pursuing the fraudulent transfer claims. First, the district court concluded that the claims were barred by the doctrine of *res judicata* because: (1) the asset-sale approval order and Adelphia's stipulation each constituted a final judgment on the merits by a court of competent jurisdiction; (2) the Adelphia D-I-P and the Banks were all creditors in the NFHLP bankruptcy proceedings, and thus the same parties were involved in both those proceedings and the present fraudulent transfer actions; and (3) a judgment in favor of the ART on the fraudulent conveyance claims would impair the judgment rendered in the NFHLP bankruptcy, given that the only remedy for a

17

fraudulent conveyance is rescission of the fraudulent transfer and the NFHLP assets were sold to Hockey Western free and clear. *Id.* at \*10-13. The district court again rejected the ART's contention that it did not have full knowledge of the factual basis for any fraudulent conveyance claims at the time of the asset sale, based on record evidence that they were at least exploring such claims. *Id.* at \*13-14.

As a second alternative ground for barring the ART's claims, the district court held that the doctrine of judicial estoppel applied, because the NFHLP bankruptcy court had relied on the Adelphia D-I-P's representation that it alone owned the Construction and Revolver Loans, a position incompatible with its present contention that the transfers were fraudulent and ought to be rescinded. *Id.* at \*17-18. Finally, the district court found the fraudulent transfer claims barred by the doctrine of quasi-estoppel, because the ART was asserting to the detriment of another a right inconsistent with a position it previously took, such that the conveyances, "although perhaps 'originally impeachable, became unimpeachable in equity.'" *Id.* at \*18-19 (quoting *Simmons v. Burlington, C.R. & N.R. Co.*, 159 U.S. 278, 291 (1895)). For each of these independent reasons, the district court declared that the ART was barred from pursuing its fraudulent conveyance claims. *Id.* at \*19.

The ART timely appealed to this Court.

18

**DISCUSSION**

I.      Standard of Review

"We exercise plenary review over a district court's rulings in its capacity as an appellate court in bankruptcy." *Community Bank, N.A., v. Riffle*, 617 F.3d 171, 174 (2d Cir. 2010) (citing *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005)). "[W]e independently examine the bankruptcy court's factual determinations and legal conclusions, accepting the former unless clearly erroneous and reviewing the latter *de novo*." *Id.* (bracketed text in original) (quoting *In re Dairy Mart Convenience Stores*, 411 F.3d at 371).

II.      Ratification and *res judicata*

Although, as we shall explain later in our discussion of judicial estoppel, we do not believe that the ART can escape the consequences of the Adelphia D-I-P's silence and stipulations at the asset-sale hearing, we cannot agree with the district court's ratification analysis, for two reasons. First, we are not persuaded that rescission is the only remedy that is ever available for a fraudulent conveyance under New York law. Second, we do not think that Adelphia demonstrated the requisite intent to ratify the fraudulent conveyances. We will discuss these points in turn, and they lead us to the conclusion that ratification does not bar the ART's fraudulent conveyance actions with respect to HSBC and Key. As we will also explain, the ratification and *res judicata* analyses are closely related in this context, and we will discuss the two doctrines together. With respect to Fleet, we conclude that *res judicata* applies to block the ART's cause of action.

"A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr.

19

S.D.N.Y. 1994) (citing G. Glenn, *Fraudulent Conveyances and Preferences*, Vol. 1, §§ 111 at 221, 113 at 223 (1940)). "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." 57 N.Y. Jur. 2d *Estoppel, Ratification, and Waiver* § 87.[6] "[R]atification may be express or implied, or may result from silence or inaction." *Id.* § 88.

As discussed above, the bankruptcy court took the view that the Adelphia D-I-P's actions ratified what it *received* from the March 2000 transaction — i.e., ownership of the Construction and Revolver loans — but not what it *paid*. The district court rejected this view on the basis that "the proper remedy in a fraudulent transfer action is rescission of the underlying transaction, not just a piece of it, such as the purchase price." *HSBC Bank USA*, 2009 WL 385474 at *8. We think the district court erred to the extent that it categorically rejected the possibility of a money judgment in lieu of rescission.

It is true, as the district court and the Banks have both observed, that in the context of discussing New York's fraudulent conveyance law we have stated that "[t]he proper remedy in a

---

[6] With the exception of a footnote in Key's brief, neither the parties nor the district and bankruptcy courts have extensively discussed the extent to which the ART's fraudulent conveyance actions arise under state law and the extent to which they arise under federal law. We proceed on the assumption and understanding that the claims the ART presently seeks to maintain against HSBC and Key must arise under New York's state laws governing fraudulent conveyances, which may be invoked in federal bankruptcy proceedings by operation of 11 U.S.C. § 544(b)(1). The version of the federal fraudulent transfer statute in effect at the time Adelphia filed its bankruptcy petition in June 2002 allowed trustees to avoid only fraudulent transfers made one year or less before the date of the filing of the petition. *See* 11 U.S.C. § 548 (2002). Because Adelphia Corp.'s take-out of the Construction and Revolver loans occurred in March 2000, the ART may not invoke the federal fraudulent transfer statute. The parties focus on New York law in their briefs, and the ART's reply brief does not challenge Key's assertion that New York law controls, and it therefore appears to us that this point is undisputed with respect to HSBC and Key. With respect to Fleet and the Concession Loan payments made within the year before Adelphia's petition was filed, the ART may, and does, assert the federal bankruptcy fraudulent transfer statute.

fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor." *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006) (citing *Geren v. Quantum Chem. Corp.*, 832 F.Supp. 728, 736-37 (S.D.N.Y. 1993)). However, this statement is taken out of context. In the portion of *Geren* that we relied upon as authority for our pronouncement in *Grace*, the concern of then-District Judge Leval was to make clear that "the action for fraudulent conveyance does not create an independent remedy of money damages against *third parties* who aided the debtors transfer . . . ." 832 F.Supp. at 737. In other words, Judge Leval was explaining the *purpose* of fraudulent transfer actions (i.e., to unwind transactions between the actual parties to the transaction) as distinct from other causes of action, and he was not describing a limitation on how that purpose might be fulfilled. *Id.* at 736-37. In *Grace*, similarly, we were required to consider whether a third-party transferee had standing to challenge a predicate judgment under N.Y. Debtor & Creditor Law § 273-a, and we cited *Geren* in the context of explaining that such standing should be rare because the remedy under § 273-a derives from the transfer of the assets and not the predicate judgment. 443 F.3d at 188-89 ("[T]he unsatisfied judgment, while a necessary predicate to bringing a . . . § 273-a case, is not a sword that can be directly turned upon third-party transferees.").

Neither *Geren* nor *Grace* held, or would logically require us to hold, that under New York law a creditors' committee cannot obtain a money judgment where the asset alleged to have been fraudulently transferred is no longer in the hands of the original transferee. Meanwhile, there is considerable authority suggesting that New York law permits exactly such a remedy when the traditional fraudulent conveyance remedy of rescission is no longer

21

practicable.  *See, e.g., Newshewat v. Salem*, 365 F. Supp. 2d 508, 521 (S.D.N.Y. 2005) ("[W]here the assets fraudulently transferred no longer exist . . . a money judgment may be entered in an amount up to the value of the fraudulently transferred assets."); *RTC Mortg. Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001) ("Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance."); *Lending Textile, Inc. v. All Purpose Accessories Ltd.*, 664 N.Y.S.2d 979, 998 (1st Dep't 1997) ("While, as a general rule, the creditor's remedy in a fraudulent conveyance action is 'limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance,' a money judgment may properly be granted as a substitute for those assets in circumstances where . . . the debtor's assets 'have been sold and commingled with those of [a transferee].'") (bracketed text in original) (internal quotation omitted); *Mfrs. and Traders Trust Co. v. Lauer's Furniture Acquisition, Inc.*, 226 A.D.2d 1056, 1057 (4th Dep't 1996) ("Where the assets of [the debtor-transferor] have been sold and commingled with those of [the transferee], a money judgment was properly granted as a substitute for those assets."); *Valentine v. Richardt*, 126 N.Y. 272, 272-73 (1891) (finding monetary judgment appropriate where property conveyed had been sold by transferee to bona fide purchaser); *see also* 30 N.Y. Jur. 2d *Creditors' Rights and Remedies* § 446 ("Where the assets fraudulently transferred no longer exist or are no longer in the possession of the transferee, a money judgment may be entered against the transferee in an amount up to the value of the fraudulently transferred assets.").

Key argues that there are no New York fraudulent conveyance cases allowing a money judgment where, as here, the allegedly ratifying party — as opposed to the transferor or

22

transferee — is responsible for the destruction of any possibility that the status quo ante could be restored. This appears to be true. But it is also true that recent New York cases do not appear to preclude that remedy under such circumstances, even if the late Nineteenth Century cases where the alternative money remedy emerged could be read to suggest that the transferee must bear responsibility for the dissolution of the original asset for a money judgment to be available. *See Valentine*, 126 N.Y. at 273 ("[A]s the fraudulent grantee had by his own act, in conveying the land to a *bona fide* purchaser, prevented the plaintiff from recovering it, equity required that he should restore to the plaintiff its equivalent in money, not as damages, but as a substitute for the land itself[,] [and] the court had power to render any judgment consistent with the facts alleged and proved."). It thus appears to us that, absent the operation of some other doctrine to bar ART's fraudulent conveyance actions, New York law would allow the possibility of a money judgment in lieu of rescission, even though the March 2000 conveyances cannot be undone in the aftermath of the NFHLP asset sale. At least with respect to the price Adelphia Corp. paid Key and HSBC, ratification did not occur, because the Adelphia D-I-P's acceptance of sole ownership of the Construction and Revolver Loans did not, as a matter of law, preclude recovery of the purchase price for those loans.

Second, we do not think the Adelphia D-I-P intended to ratify the purchase price. "Mere negligence is not ratification[,] . . . [but] an act, such as an acceptance of benefits, may constitute a ratification, and acquiescence may give rise to an implied ratification . . .." 57 N.Y. Jur. 2d *Estoppel, Ratification, and Waiver* § 2. The intent required for ratification "must be clearly established and may not be inferred from doubtful or equivocal acts or language." *Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999) (quoting *Holm v. C.M.P. Sheet*

23

*Metal, Inc.*, 455 N.Y.S.2d 429, 432 (4th Dep't 1982)). Where the allegedly ratifying party's

silent acquiescence to a transaction credibly appears to have resulted from the complexity of the

situation rather than intent, ratification does not occur. *See, e.g., King v. Ionization Int'l, Inc.*,

825 F.2d 1180, 1187 (7th Cir. 1987) (Posner, J.). Although intent can be shown by implication,

the Banks do not point to anything in the record suggesting such intent on the part of Adelphia

Corp. at the sale hearing, and the bankruptcy court's opinion suggests that the Adelphia D-I-P,

although it may have been impermissibly inattentive to the causes of action available to it, was

not acting with intent to ratify. We conclude that the Adelphia D-I-P did not ratify the price it

paid for the Construction and Revolver Loans.

And with respect to the Construction and Revolver Loans, there is little difference

between ratification and *res judicata*. The doctrine of *res judicata*, or claim preclusion, applies

in "later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of

competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving

the same cause of action." *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624

(2d Cir. 2007) (bracketed text in original) (quoting *In re Teltronic Servs., Inc.*, 762 F.2d 185, 190

(2d Cir. 1985)). If those criteria are met, "[a] final judgment on the merits . . . precludes the

parties or their privies from relitigating issues that were or could have been raised in that action."

*Id.* (bracketed text in original) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000)

(alteration in the original)). "This rule applies with full force to matters decided by the

bankruptcy courts." *Id.*

There is no doubt that the bankruptcy court's order approving the sale of the hockey

team's assets was a final judgment on the merits of an action by a court of competent

24

jurisdiction, and we may assume for present purposes that, as the district court held, the NFHLP and Adelphia bankruptcies are sufficiently intertwined that they may be considered the same cause of action. But as to the Construction and Revolver Loans, we do not see how *res judicata* can apply in light of our ratification analysis and, in particular, our conclusion that New York law allows remedies other than rescission under certain circumstances. All that the bankruptcy court did was to approve a § 363 sale at which the Adelphia D-I-P appeared as a creditor, and the orders and stipulations entered into at that time merely confirmed that Hockey Western was acquiring the assets free and clear. These orders in no way resolved the issue of whether the price Adelphia Corp. paid for the Construction and Revolver Loans was fair, given that New York law would allow a money judgment even after rescission ceased to be a legal possibility. If it is the case that the conduct of the Adelphia D-I-P at the § 363 sale ought to deprive it of the opportunity to bring a fraudulent conveyance action because the banks would have proceeded differently had they known of the possibility of such actions, that is an equitable argument arising in some form of estoppel, an argument we will turn to momentarily. It is not an argument about the legal consequences of the asset sale, and *res judicata* cannot apply as to the Construction and Revolver Loans.

The Concession Loan is a different matter. Unlike the other Banks, who did not appear in connection with the sale proceeding, Fleet and the Adelphia D-I-P negotiated as parties-in-interest as to who would get paid what from the sale of the team. In doing so, both Fleet and the Adelphia D-I-P agreed to certain sale terms that gave the Adelphia D-I-P credit for the approximately $11 million in payments Adelphia Corp. had already made to service the Concession Loan. So, in this respect, the Adelphia D-I-P received consideration not merely

25

from the third-party purchaser (as was the case with the Construction and Revolver Loans, which by the time of the asset sale were wholly owned by Adelphia), but also *from Fleet*, who the ART now contends Adelphia Corp. should never have paid in the first place. Having sat across the table from Fleet, and bargained for (and benefitted from) the terms on which the Concession Loan was cashed out, the Adelphia D-I-P directly confronted the valuation of the payments it had made to Fleet on the Concession Loan. Thus, the issue that was not resolved with respect to the Construction and Revolver Loans — the fairness of the price paid by Adelphia — *was* necessarily resolved with respect to the Concession Loan. For better or for worse, the Adelphia D-I-P consented to Fleet's demand that it be paid in full for the Concession Loan, and this was integral to approval of the asset sale. A bankruptcy court order confirming an asset sale is a final judgment capable of having *res judicata* effect. *See In re Am. Preferred Prescription, Inc.*, 255 F.3d 87, 92 (2d Cir. 2001) (citing *Hendrick v. H.E. Avent,* 891 F.2d 583, 585-87 (5th Cir.1990); *Gekas v. Pipin,* 861 F.2d 1012, 1016-18 (7th Cir.1988)). To allow the ART to challenge the decision made at the time of the asset sale would necessarily call into question the validity of the price paid at that time and confirmed by the court, which is exactly what *res judicata* prohibits.

Like the district court, we reject the ART's argument that *res judicata* cannot apply because counsel for the Adelphia D-I-P lacked sufficient knowledge of potential fraudulent conveyance actions at the time of the asset sale. Even assuming that it was necessary for the Adelphia D-I-P to have known not only the facts that would have been the basis of its claims but also the viability of its right of action — which we doubt — the Adelphia D-I-P was then less than three months away from filing its fraudulent conveyance actions, and we cannot imagine any intervening events that would have further convinced it to proceed with its potential actions.

26

And we have held that "[r]*es judicata* applies even where new claims are based on newly discovered evidence, unless the evidence was either fraudulently concealed or it could not have been discovered with due diligence." *L-TEC Elecs. Corp. v. Cougar Elec. Org.*, 198 F.3d 85, 88 (2d Cir. 1999) (internal quotation marks omitted).

We have considered the ART's other arguments that *res judicata* cannot apply, and with respect to the Concession Loan we find them without merit.

III.    Judicial estoppel

We must now consider whether the equitable doctrine of judicial estoppel requires that the ART be estopped from pursuing its claims with respect to the Construction and Revolver Loans even though the asset sale did not strip it of all possible remedies.

> A potential consequence of a conflict between two factual statements made by the same party is judicial estoppel: 'Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'

*DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)). "Typically, judicial estoppel will apply if: 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Id.*, 595 F.3d at 103 (quoting *New Hampshire*, 532 U.S. at 750-51). The third requirement is sometimes couched in terms of "unfair detriment [to] the opposing party" rather than advantage to the party to be estopped. *New Hampshire*, 532 U.S. at 751. In this circuit, moreover, "[w]e further limit 'judicial estoppel to situations where the risk of inconsistent results with its impact on judicial

27

integrity is certain.'" *DeRosa*, 595 F.3d at 103 (quoting *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)). This latter requirement means that judicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements. *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997).

Before we turn to these enumerated elements of judicial estoppel, we first address the ART's insistence that we cannot find judicial estoppel because invocation of this doctrine requires a finding that the party against whom estoppel is sought played "fast and loose with the courts." *New Hampshire*, 532 U.S. at 750 (quoting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits."). According to the ART, "there is no evidence in the record that Adelphia's counsel said anything to [either bankruptcy court] that was intentionally untrue or misleading" and "Adelphia's counsel told the court the truth and the whole truth that he knew at the time." ART Br. at 82. This argument presupposes that judicial estoppel cannot apply unless counsel for the Adelphia D-I-P was confident, at the time of the asset sale, that fraudulent conveyance actions would soon be brought against the Banks. We disagree with this assumption. The purpose of judicial estoppel is not to look for, or punish, outright lies, but "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749-50 (internal citation omitted). In our view a party puts the integrity of the judicial process at risk not only when it knowingly lies but when it takes

28

a position in the short term knowing that it may be on the verge of taking an inconsistent future action.

The bankruptcy court focused on the subjective intent of the attorney who represented the Adelphia D-I-P at the sale hearing, and the parties have maintained this focus in their arguments before us. In the context of judicial estoppel, however, the proper focus is on the objective conduct of a party or its counsel. Although the Adelphia D-I-P may have lacked any intent to ratify the price Adelphia Corp. had paid for the loans in March 2000, it chose to use one set of lawyers in the Southern District of New York who were at least considering filing fraudulent transfer actions, while employing other lawyers in the Northern District of New York in the NFHLP proceeding without making them aware of the possibility that such actions could be filed. As we have noted, *see supra* pp. 8-9, the Adelphia D-I-P had several bases for knowing, well before the asset sale, that avoidance actions might be available to it. Indeed, since Adelphia D-I-P brought its massive fraudulent conveyance action less than three months after the approval of the sale, the inference is inescapable that that action was being actively contemplated at the very time of the proceeding in the NFHLP bankruptcy court. Whether or not the attorney who appeared for the Adelphia D-I-P at that proceeding was or should have been cognizant of the possibility of such an action, it is clear that his client was. A party cannot escape judicial estoppel by keeping its attorney in the dark about its plans.

As we have already explained, *res judicata* and ratification do not bar the ART from bringing fraudulent conveyance actions with respect to HSBC and Key. But the doctrine of judicial estoppel serves a different jurisprudential purpose. *Res judicata* is designed to protect the finality of judgments, and it does not bar "causes of action [that are] parallel but distinct."

29

*King v. Fox*, 418 F.3d 121, 131 (2d Cir. 2005). For the reasons stated, we are not convinced that rescission is the sole remedy for a fraudulent conveyance under New York law, so the ART is correct that its fraudulent conveyance actions against HSBC and Key are distinct from its advocacy of a free-and-clear sale of the hockey team's assets, although the two proceedings were indubitably parallel. Ratification, for its part, is concerned with a party's intentional relinquishment of a previously viable right to void a transaction, and here, the bankruptcy court's findings suggest that, at least as to HSBC and Key, the Adelphia D-I-P did not possess the requisite intent to *ratify* but only the intent to avoid dealing with a certain set of claims for the time being.

Judicial estoppel, on the other hand, is concerned not with the repose of individual claims but with the ability of courts to render their decisions based on faithful representations by counsel. Ratification and estoppel are "closely allied," but "[r]atification has also been contrasted with estoppel in the sense that a party is bound by ratification because he or she intends to be bound and is willing to be, whereas estoppel arises out of the inducement of another to act to his or her prejudice." N.Y.Jur.2d Estoppel § 87. We think it will be the rare case in which the silence of a party (or its counsel) is not adequate to cause ratification but exposes the party to judicial estoppel, but this is that rare case.

Turning back to the three enumerated requirements for the application of judicial estoppel, we conclude that they are satisfied here. The most difficult to apply in this context is the first — the requirement that the party to be judicially estopped is now taking a position "clearly inconsistent with its earlier position." *DeRosa*, 595 F.3d at 103 (quoting *New Hampshire*, 532 U.S. at 750-51). We have already determined that the ART could have pursued

30

a money judgment notwithstanding the possibility of rescission even after the asset sale, and thus it might be argued that the ART's current position is not clearly inconsistent with its silence at the asset sale. But we think it is enough that both the bankruptcy court and the banks undoubtedly would have approached the sale differently had Adelphia disclosed the possibility of fraudulent conveyance actions at the sale hearing. Under 11 U.S.C. § 363(f)(2), assets may be sold free and clear of the interest of "an entity other than the estate[] only if . . . such entity consents." It is certainly true that after the sale in this case was confirmed, the Banks had no recourse to the hockey team assets that were once their collateral. But had the Banks been made aware of potential fraudulent conveyance actions before the sale was confirmed, rescission would have remained a legal possibility *at that time*, giving the Banks an interest in the assets. As the bankruptcy court made clear, there was "no doubt in th[e] [c]ourt's mind" that, if the Banks then invoked § 363(f)(2) and withheld consent for the sale, it would have delayed approval of the sale until ownership of the lien rights were resolved. Bankr. Ct. Op. at 20-21.

By taking the position before the bankruptcy court that it, and it alone, had an interest in the Construction and Revolver Loans at the time of the asset sale, the Adelphia D-I-P left that court with the distinct, and false, belief that there were no other entities that might have an interest in objecting to a free-and-clear sale. The position the ART takes now, however — that, in fact, even back at the time of the sale confirmation proceedings, the prices that had been paid for the loans resulted in fraudulent conveyances subject to rescission — cannot be reconciled with that earlier position.

The second criterion for judicial estoppel — that the earlier position have been adopted in some manner by the court — is easily satisfied here, as the Adelphia D-I-P's representations

31

were indispensable to the bankruptcy court's willingness to enter the sale order. With respect to the third requirement, the Adelphia D-I-P gained a significant unfair advantage: immediate sale of the hockey team but preservation of its ability to bring avoidance actions against the Banks. The Banks, meanwhile, lost the ability to reclaim their collateral in the event that any fraudulent conveyance action proved successful. That a money judgment is *one* possible remedy for a fraudulent conveyance available in certain circumstances does not mean that the ART can blithely assume it is all the same to the Banks, who, as the bankruptcy court noted, might have simply preferred to accept rescission, reclaim their lien rights, and exercise them upon the assets. *See* Bankr. Ct. Op. at 20-21.

The bankruptcy court's opinion did not analyze the doctrine of judicial estoppel as a grounds for relief distinct from ratification,[7] but we understand that court to have denied all relief to HSBC and Key — including, necessarily, relief based on judicial estoppel — simply because those two Banks did not appear at the § 363 sale hearing. In the context of judicial estoppel, this was error, because there was no reason why those Banks would have thought themselves obliged to appear at the sale hearing, and because judicial estoppel, unlike other equitable doctrines, is concerned with "the integrity of the judicial process, . . . [as opposed to] fairness between the parties." *OSRecovery, Inc. v. One Groupe Int'l., Inc.*, 462 F.3d 87, 93 n.3 (2d Cir. 2006) (distinguishing judicial estoppel from equitable estoppel). As the bankruptcy court itself noted, "[a] simple mention of HSBC and Key by Adelphia would have caused this [c]ourt to bring them here." Bankr. Ct. Op. at 28. Such an order would only have issued if the

---

[7] At one point, the bankruptcy court opinion appears to reject the application of any common law doctrines at all, and declines to discuss the parties' arguments with respect to the "common law elements of ratification, release, estoppel, waiver, etc." Bankr. Ct. Op. at 27.

Adelphia D-I-P had informed the court that it was contemplating avoidance actions, and absent an invitation from the bankruptcy court, there was no reason for those Banks to appear, as it is uncontested that by the time of Adelphia Corp.'s bankruptcy it had acquired 100 percent ownership in those Banks' interests in the Loans. We agree that HSBC and Key deserved no benefit from ratification or *res judicata*, but in considering whether to apply judicial estoppel a court must focus on the conduct of the party to be estopped, not the party seeking estoppel. Indeed, although a court is unlikely to be asked to apply judicial estoppel when no party has been prejudiced, it is unfair *advantage* to the potentially prejudiced party's adversary that is the touchstone of the doctrine. *See DeRosa*, 595 F.3d at 103 (the doctrine of judicial estoppel applies "especially" when it prejudices "the party who has acquiesced in the position formerly taken by [the party to be estopped]," but the question presented when applying the doctrine is whether a party has successfully maintained a position in one proceeding and assumed a contrary position in another proceeding after his interests have changed).

Far from preventing HSBC and Key from invoking the doctrine of judicial estoppel to their benefit, their absence from the sale hearing demonstrates precisely why the doctrine is necessary. Although we admire the bankruptcy court's instinct to avoid deciding matters it may not have considered to be before it, it is that court, and its ability to discharge its responsibilities efficiently, that the doctrine protects. If the Adelphia D-I-P had ensured that its Western District lawyers informed the bankruptcy court of what its Southern District lawyers were contemplating, the bankruptcy court could have addressed the fairness of the sale at a continued hearing.

The ART argues that neither the Banks nor the bankruptcy court could have stopped the sale, even if the Adelphia D-I-P's counsel had spoken up, because 11 U.S.C. § 363(f)(5)

33

provides that an entity with an interest in assets to be sold may be "compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." Yet this approach would have required further proceedings, and a determination that the "sale [wa]s equitable for all concerned." *In re Investors Funding Corp. of N.Y.*, 592 F.2d 134, 138 (2d Cir. 1979). The bottom line is that by failing adequately to ensure that all of its lawyers were mindful of its potential causes of action, the Adelphia D-I-P allowed the mechanisms for fair and efficient resolution of its fraudulent conveyance actions to slip away, foregoing the speedy resolution of those claims at the sale hearing for a lengthy and costly proceeding in the NFHLP bankruptcy court and on this appeal, to be followed in the event of the ART's success on this appeal by a continuation of the actions in the Adelphia bankruptcy court in a different district. We cannot say how the claims would have been resolved if appropriately addressed in the NFHLP bankruptcy court, but we can say that the Adelphia D-I-P's failure to make that court aware of them judicially estops the ART from pursuing them now.

V.      Quasi-estoppel

Because we conclude that the ART's fraudulent conveyance actions are barred under other doctrines, we need not, and do not, review the district court's analysis of the doctrine of quasi-estoppel.

**CONCLUSION**

We affirm the judgment of the district court.

34